# UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

GREGORY RHODES,

          Plaintiff,

   v.

ALAMEIDA, et.al.,

          Defendant.

CASE NO. 1:02-CV-5476-AWI DLB-P

FINDINGS AND RECOMMENDATIONS RECOMMENDING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT BE GRANTED

(Docs. 76)

I. <u>Defendants' Motion for Summary Judgment</u>

    A. <u>Procedural History</u>

Plaintiff is a state prisoner proceeding pro se and in forma pauperis in this civil action pursuant to 42 U.S.C. § 1983. This action is proceeding against defendants Alameida, Brown. Vogel, and Adkinson on plaintiff's claim that defendants Adkinson, Vogel and Brown violated his Fourteenth and Fifth Amendment right to due process by failing to store his disallowed property until he was released from the Security Housing Unit (SHU). He also claims his rights under the Equal Protection Clause, First Amendment and Eighth Amendment were violated.

On September 12, 2007, defendants filed a motion for summary judgment. Plaintiff filed an opposition on November 14, 2007.[1] Defendants filed a reply on January 3, 2008. Plaintiff filed a sur-reply on February 22, 2008.

    B. <u>Legal Standard</u>

---

[1] Plaintiff was provided with notice of the requirements for opposing a motion for summary judgment by the court in an order filed on September 27, 2005. <u>Klingele v. Eikenberry</u>, 849 F.2d 409 (9th Cir. 1988).

1

Summary judgment is appropriate when it is demonstrated that there exists no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). Under summary judgment practice, the moving party

> [A]lways bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which it believes demonstrate the absence of a genuine issue of material fact.

Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). "[W]here the nonmoving party will bear the burden of proof at trial on a dispositive issue, a summary judgment motion may properly be made in reliance solely on the 'pleadings, depositions, answers to interrogatories, and admissions on file.'" Id. Indeed, summary judgment should be entered, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. Id. at 322. "[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." Id. In such a circumstance, summary judgment should be granted, "so long as whatever is before the district court demonstrates that the standard for entry of summary judgment, as set forth in Rule 56(c), is satisfied." Id. at 323.

If the moving party meets its initial responsibility, the burden then shifts to the opposing party to establish that a genuine issue as to any material fact actually does exist. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). In attempting to establish the existence of this factual dispute, the opposing party may not rely upon the denials of its pleadings, but is required to tender evidence of specific facts in the form of affidavits, and/or admissible discovery material, in support of its contention that the dispute exists. Rule 56(e); Matsushita, 475 U.S. at 586 n.11. The opposing party must demonstrate that the fact in contention is material, i.e., a fact that might affect the outcome of the suit under the governing law, Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir. 1987), and that the dispute is genuine, i.e., the evidence is such that a reasonable jury could

///

return a verdict for the nonmoving party, Wool v. Tandem Computers, Inc., 818 F.2d 1433, 1436 (9th Cir. 1987).

In the endeavor to establish the existence of a factual dispute, the opposing party need not establish a material issue of fact conclusively in its favor. It is sufficient that "the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial." T.W. Elec. Serv., 809 F.2d at 631. Thus, the "purpose of summary judgment is to 'pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial.'" Matsushita, 475 U.S. at 587 (quoting Fed. R. Civ. P. 56(e) advisory committee's note on 1963 amendments).

In resolving the summary judgment motion, the court examines the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any. Rule 56(c). The evidence of the opposing party is to be believed, Anderson, 477 U.S. at 255, and all reasonable inferences that may be drawn from the facts placed before the court must be drawn in favor of the opposing party, Matsushita, 475 U.S. at 587 (citing United States v. Diebold, Inc., 369 U.S. 654, 655 (1962) (per curiam). Nevertheless, inferences are not drawn out of the air, and it is the opposing party's obligation to produce a factual predicate from which the inference may be drawn. Richards v. Nielsen Freight Lines, 602 F. Supp. 1224, 1244-45 (E.D. Cal. 1985), aff'd, 810 F.2d 898, 902 (9th Cir. 1987).

Finally, to demonstrate a genuine issue, the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts. Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" Matsushita, 475 U.S. at 587 (citation omitted).

C.   Discussion

   1.   Undisputed Facts

1.  Plaintiff is lawfully incarcerated pursuant to a 1990 conviction for murder.
2.  On May 10, 2000, plaintiff was adjudged guilty of committing a serious rule violation and was sentenced to an eighteen month term in the Security Housing Unit (SHU).
3.  On June 20, 2000, plaintiff was received into the Corcoran SHU.

3

4. California prison regulations limit the amount and type of property all inmates may possess in prison. For example, inmates may possess no more than six cubic feet of property, excluding legal property. Male inmates may not possess more than one ring or rings with stone in them. Inmates are limited in the type and amount of clothing, hygiene, food, and miscellaneous items they may possess. Inmates may not possess appliances that are broken or inoperable. Inmates must be able to show proof of ownership of property.

5. Inmates housed in the SHU are even more limited in the type and amount of property they may possess. The purpose of this additional restriction is to maintain greater security and control over SHU inmates, since these inmates have a greater demonstrated propensity for violence and disruptive behavior.

6. California prison regulations further limit the amount and type of property inmates housed in the SHU may possess. For example, SHU inmates may only possess 5 books and magazines, 1 legal pad, 15 photographs, and one appliance, ie., either a television or radio, but not both.

7. When an inmate is received at Corcoran, his property is delivered separately, and is directed to specific staff members who are responsible for examining new inmate property, determining whether the property is allowed and issuing the allowed property to the newly received inmate.

8. When the inmate is housed in the SHU, the staff member who examines the property is the Facility 4A and/or 4B property officer.

9. The property officer issues the property the inmate is permitted to possess and the remaining property is held. The inmate is provided an opportunity to mail the held property out of the prison at his own expense. If the inmate does not mail the property out after 30 days, the property is either donated or destroyed.

10. On June 18, 2000, the Corcoran Facility 4-A Property Room received the property of inmate Gregory Rhodes, E-73249, from High Desert State Prison. Officer Adkison and the other property officers processed inmate Rhodes' property according to regulations.

11. The Facility 4-A Property Room inventoried Rhoades' property to make a record of the

|   |   |   |
|---|---|---|
| 1 |     | property he possessed and to inspect and confiscate any property that inmates in the Corcoran |
| 2 |     | SHU may not possess. |
| 3 | 12. | Inmate Rhoades possessed certain property that was not permitted. This property was |
| 4 |     | confiscated. The items that were confiscated included aftershave, bandanas, excess books, |
| 5 |     | tapes, letters, magazines, photos and envelopes, soap, socks, tennis shoes, clothing, tobacco, |
| 6 |     | a watch, a radio, a hotpot, a coaxial cable, tatoo equipment, sage and feathers, and a ring with |
| 7 |     | a stone in it. These items were recorded on a CDC form, which was provided to Inmate |
| 8 |     | Rhoades. |
| 9 | 13. | On August 3, 2000, staff in the Property Room issued Rhoades his allowed property. |
| 10 | 14. | On August 4, 2000, Officer Adkison sent Rhoades a CDC Form 128B, General Chrono. The |
| 11 |    | CDC Form 128B is a notice that informed Rhoades that he must fill out the paperwork to |
| 12 |    | authorize the Property Room to use his funds to ship out his property and identify the address |
| 13 |    | to ship the funds to, or the property would be donated or destroyed in 30 days, pursuant to |
| 14 |    | institutional regulations and Title 15. |
| 15 | 15. | Inmate Rhoades never submitted a form permitting staff to use money from his trust account |
| 16 |    | to ship his excess/disallowed property out of the prison. Neither did he provide an address |
| 17 |    | where the property could be shipped. |
| 18 | 16. | On September 19, 2000, Rhoades' property was disposed of (donated or destroyed) because |
| 19 |    | he had not compelled the paperwork necessary to ship the two boxes out for storage. |
| 20 | 17. | Inmate Rhoades never informed Officer Adkison before the property was disposed of that |
| 21 |    | any of his property had religious significance. |
| 22 | 18. | Even if Officer Adkison had known that Rhoades attached religious or spiritual significance |
| 23 |    | to the disallowed items, he would be obliged to follow Corcoran's policies for contraband |
| 24 |    | items. The only exception to the institution property rules that would permit inmates to |
| 25 |    | possess property otherwise considered to be contraband or disallowed religious items, is |
| 26 |    | when the inmate property has been certified as being a religious artifact, the religious leader |
| 27 |    | at the prison (with delegated authority from the Warden) must provide the inmate with a |
| 28 |    | written authorization to possess the item, and a statement establishing that the item is a |

5

|  |  |  |
|---|---|---|
| 1 |  | religious artifact. |
| 2 | 19. | Inmate Rhoades had no certification establishing that any of his property was a religious |
| 3 |  | artifact. |
| 4 | 20. | Officer Adkison acted to enforce Corcoran's and CDCR's regulations for handling of inmate |
| 5 |  | property to the best of my ability. If he had been aware that Rhoades had a form establishing |
| 6 |  | that a particular item of his property was a religious artifact, he would have donated or |
| 7 |  | disposed of that item. He harbored no animosity against inmate Rhoades and had no desire |
| 8 |  | to harm him. He took the actions described in the declaration with the belief that they were |
| 9 |  | necessary and lawful. |
| 10 | 21. | On September 9, 2003, plaintiff filed an inmate grievance contesting the disposal of his |
| 11 |  | property. |
| 12 | 22. | On October 3, 2000, Officer Adkison timely responded to the grievance at the informal level, |
| 13 |  | explaining that inmate Rhoades' property had been disposed of pursuant to institutional |
| 14 |  | regulations. |
| 15 | 23. | Sergeant Vogel reviewed inmate Rhoades' appeal at the first formal level of review. |
| 16 | 24. | It appeared to Sergeant Vogel from a review of the appeal that Rhoades wanted staff to make |
| 17 |  | an exception to the rules and have the prison store his disallowed property at state expense. |
| 18 | 25. | There was nothing in the appeal that led Vogel to believe any such exception was justified |
| 19 |  | or even permissible and therefore, he denied the appeal. |
| 20 | 26. | Sergeant Vogel took no other action in connection with inmate Rhoades' property. |
| 21 | 27. | At all times Sergeant Vogel attempted to enforce Corcoran's and CDCR's regulations for the |
| 22 |  | handling of inmate property to the best of his ability. He harbored no animosity against |
| 23 |  | inmate Rhoades and had no desire to harm him. He took the actions described in the |
| 24 |  | declaration with the belief that they were necessary and lawful. |
| 25 | 28. | Chief Deputy Warden Brown reviewed the appeal that staff had acted appropriately in |
| 26 |  | withholding Rhoades' disallowed/contraband property and providing him with an |
| 27 |  | opportunity to mail the property to an outside address. |
| 28 | 29. | It appeared to Brown from reviewing the appeal that staff had acted appropriately in |

1        withholding Rhoades' disallowed/contraband property and providing him with an
2        opportunity to mail the property to an outside address.
3   30.    Therefore, Brown denied the appeal.
4   31.    Brown took no other action in connection with inmate Rhoades' property.
5   32.    At all times Brown attempted to enforce Corcoran's and CDCR's regulations for the
6        handling of inmate property to the best of his ability. He harbored no animosity against
7        inmate Rhoades and had no desire to harm him. He took the actions described in the
8        declaration with the belief that they were necessary and lawful.
9   33.    E. Alameida became the Director of the California Department of Corrections and
10       Rehabilitation on September 22, 2001.
11   34.    CDCR makes religious programs available to all inmates of varying faiths, including
12       religious services, faith-based observances, self study courses and education.
13   35.    While housed in the Corcoran SHU inmate Rhoades was visited by a Native American
14       spiritual advisor who brought sage and tobacco to use in prayers.
15   36.    Rhoades contends Alameida is liable for his loss of property because, as the Director,
16       Alameida permitted the policies to exist whereby correctional staff disposed of Rhoades'
17       property. He does not contend defendant Alameida had any direct involvement in disposing
18       of the property.

           3.    <u>Free Exercise Claim</u>

Plaintiff contends that by taking his religious items, prison officials prevented him from using religious artifacts to carry out his religious rituals and practices.

The First Amendment to the United States Constitution provides that "Congress shall make no law respecting the establishment of religion, or prohibiting the free exercise thereof . . . ." U.S. Const., amend. I. Prisoners "retain protections afforded by the First Amendment," including the free exercise of religion. <u>O'Lone v. Estate of Shabazz</u>, 482 U.S. 342, 348, 107 S.Ct. 2400 (1987). However, "'[l]awful incarceration brings about the necessary withdrawal or limitation of many privileges and rights, a retraction justified by the considerations underlying our penal system.'" <u>Id</u>. (quoting <u>Price v. Johnson</u>, 334 U.S. 266, 285, 68 S.Ct. 1049, 1060 (1948)). "In order to establish

a free exercise violation, [a prisoner] must show the defendants burdened the practice of his religion, by preventing him from engaging in conduct mandated by his faith, without any justification reasonably related to legitimate penological interests." Freeman v. Arpaio,125 F.3d 732, 736 (9th Cir. 1997). "In order to reach the level of a constitutional violation, the interference with one's practice of religion 'must be more than an inconvenience; the burden must be substantial and an interference with a tenet or belief that is central to religious doctrine.'" Freeman, 125 F.3d at 737 (quoting Graham v. C.I.R., 822 F.2d 844, 851 (9th Cir. 1987)).

"To ensure that courts afford appropriate deference to prison officials, . . . prison regulations alleged to infringe constitutional rights are judged under a 'reasonableness' test less restrictive than that ordinarily applied to alleged infringements of fundamental constitutional rights." O'Lone, 382 U.S. at 349. Under this standard, "when a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests." Turner v. Safley, 482 U.S. 78, 89, 107 S.Ct. 2254 (1987). First, "there must be a valid, rational connection between the prison regulation and the legitimate government interest put forward to justify it," and "the governmental objective must itself be a legitimate and neutral one." Id. A second consideration is "whether there are alternative means of exercising the right that remain open to prison inmates." Id. at 90 (internal quotations and citation omitted). A third consideration is "the impact accommodation of the asserted right will have on guards and other inmates, and on the allocation of prison resources generally." Id. "Finally, the absence of ready alternatives is evidence of the reasonableness of a prison regulation." Id.

Defendants submit evdence that the prison regulations proscribing a maximum number of cubic feet of inmate property and restricting specific items of property serve a legitimate correctional and governmental interest. Defendants argue the further restrictions on property that SHU inmates may possess are also justified in that greater security and control over these inmates is necessary as they have a greater demonstrated propensity for violence and disruptive behavior. DUF 5-6.

Defendants also contend that plaintiff had alternative means of exercising his religion. They submit evidence that while plaintiff was housed in the Corcoran SHU, he was visited by a Native American spiritual advisor who brought sage and tobacco to use in prayers. UF 35. Defendants also

8

submit evidence that CDCR makes religious programs available to all inmates of varying faiths, including religious services, faith based observances, self study courses and education. UF 34.

Defendants contend the third *Turner* factor also weighs in their favor in that abolishing the prison regulations on inmate property would create serious risks to the health and safety of inmates and staff and impose a financial burden on the prison system. Defendants argue if the prison could not limit the amount and type of property inmates may possess, the already crowded prisons would become unmanageable. Defendants contend excessive property would create fire and health hazards and permit inmates to hide weapons in crowded cells; without restrictions on clothing items, inmates could impersonate staff and identify more easily with disruptive groups; inmates who possess rings with stones in them could fashion the stones into cutting weapons; and further requiring CDCR to store inmate property or pay the postage costs for inmates to mail out their property would impose too high a cost on public resources.

Finally, Defendants submit evidence that the regulations provide an alternative to destruction of inmate religious property by permitting inmates to possess what might otherwise be contraband items if they have been certified as being a religious artifact. DUF 18. For an item of inmate property to be considered a religious artifact, the religious leader at the prison must provide the inmate with a written authorization to possess the item and a statement establishing that the item is a religious artifact. *Id*. Plaintiff did not avail himself of this alternative and had no certification establishing that any of his property was a religious artifact. DUF 19. Defendants contend there is no readily available alternative other than stated, that would preserve the institutional need to keep control over inmate property and maintain a safe, clean institutional environment.

The court finds that defendants have met their initial burden of informing the court of the basis for their motion, and identifying those portions of the record which they believe demonstrate the absence of a genuine issue of material fact. The burden therefore shifts to plaintiff to establish that a genuine issue as to any material fact actually does exist. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). As stated above, in attempting to establish the existence of this factual dispute, plaintiff may not rely upon the mere allegations or denials of his pleadings, but is required to tender evidence of specific facts in the form of affidavits, and/or

9

admissible discovery material, in support of its contention that the dispute exists. Fed. R. Civ. P. 56(e); Matsushita, 475 U.S. at 586 n.11; First Nat'l Bank, 391 U.S. at 289; Strong v. France, 474 F.2d 747, 749 (9th Cir. 1973). Plaintiff must do more than attack the credibility of defendants' evidence, see National Union Fire. Ins. Co. v. Argonaut Ins. Co., 701 F.2d 95, 97 (9th Cir. 1983) ("[N]either a desire to cross-examine an affiant nor an unspecified hope of undermining his or her credibility suffices to avert . . . judgment."), and arguments or contentions set forth in a responding brief do not constitute evidence, see Coverdell v. Dep't of Soc. & Health Servs., 834 F.2d 758, 762 (9th Cir. 1987) (recitation of unsworn facts not evidence).[2]

With respect to the first prong of the *Turner* analysis, it is undisputed that there is a rational connection between the regulation and the safety and security concerns identified by plaintiff.

The second prong requires the court to examine whether, notwithstanding the regulation on one aspect of plaintiff's religion, plaintiff still has alternative means of exercising his religion. Plaintiff does not dispute that he was visited by a Native American Spiritual Leader, who brought sage and tobacco to use in prayer. *See* Opposition at p.719-21. He instead argues that some of his religious items were "personal in nature" to which there are no alternative means. However, in evaluating the second prong of the *Turner* test, the relevant inquiry is not whether the inmate has an alternative means of engaging in a particular religious practice that he or she claims is being affected; rather the court is to determine whether the inmates have been deprived all mean of religious expression. *See* O'Lone v. Estate of Shabazz, 482 U.S. 342, 348, 107 S.Ct. 2400 (1987).

The third prong requires the court to assess the burden that accommodating plaintiff's request would place on prison resources. Defendants argue that abolishing the prison regulations on inmate property would create serious risks to the health and safety of inmates and staff and impose a financial burden on the prison system. Plaintiff argues the regulations are an exaggerated response and there is no safety or security concern. The parties, however, submit only argument but no evidence in support of their contentions. The court notes that it is difficult to imagine how

---

[2] However, verified complaints and oppositions constitute opposing affidavits for purposes of the summary judgment rule if they are based on facts within the pleader's personal knowledge. Johnson v. Meltzer, 134 F.3d 1393, 1399-1400 (9th Cir. 1998).

abolishing the property regulations at issue would not have a significant impact on guards and the allocation of prison resources.

As to the fourth prong of the analysis, defendants are unaware and plaintiff has not offered any other obvious, readily available alternatives that would preserve the institutional need to keep control over inmate property and maintain a safe, clean institutional environment.

Even assuming defendants have not met their burden on the third prong, the other factors weigh in defendants' favor. The *Turner* test is a balancing test and not every prong must be met in order to find that a regulation is reasonably related to a legitimate penological interest. Based on the undisputed evidence, the Court finds that the regulation at issue is reasonably related to a legitimate penological interest and therefore plaintiff's claim must fail as a matter of law.

### 2. Equal Protection Claim

"The Equal Protection Clause . . . is essentially a direction that all persons similarly situated should be treated alike." City of Cleburne v. Cleburne Living Ctr., Inc., 473 U.S. 432 (1985) (citing Plyler v. Doe, 457 U.S. 202, 216 (1982)). "[P]rison officials cannot discriminate against particular religions." Freeman, 125 F.3d at 737. "'To state a claim . . . for a violation of the Equal Protection Clause . . . a plaintiff must show that the defendants acted with an intent or purpose to discriminate against the plaintiff based upon membership in a protected class.'" Lee v. City of Los Angeles, 250 F.3d 668, 686 (9th Cir. 2001) (quoting Barren v. Harrington, 152 F.3d 1193, 1194 (9th Cir. 1998)). "Intentional discrimination means that a defendant acted at least in part *because of* a plaintiff's protected status." Serrano v. Francis, 345 F.3d 1071, 1082 (9th Cir. 2003) (quoting Maynard v. City of San Jose, 37 F.3d 1396, 1404 (9th Cir. 1994)) (emphasis in original). "To avoid summary judgment, [plaintiff] 'must produce evidence sufficient to permit a reasonable trier of fact to find by a preponderance of the evidence that [defendants'] decision was . . . motivated'" by plaintiff's membership in a protected class. Serrano, 345 F.3d at 1082 (quoting Bingham v. City of Manhattan Beach, 329 F.3d 723, 732 (9th Cir. 2003) (citations and alterations omitted)).

"Where the challenged governmental policy is 'facially neural,' proof of its disproportionate impact on an identifiable group can satisfy the intent requirement only if it tends to show that some invidious or discriminatory purpose underlies the policy." Lee, 250 F.3d at 687 (citing Village of

11

Arlington Heights v. Metro. Hous. Dev. Corp., 429 U.S. 252 (264-66) (1977) (internal citations omitted)). "The mere fact that [a] facially neutral polic[y] had a foreseeably disproportionate impact on an identifiable group does not mean that [it] violated the Equal Protection Clause." Id. at 687.

Defendants argue, supported by the declaration of defendant Vogel, that the regulations relied on in processing plaintiff's property apply to all inmates. DUF 9. Plaintiff has not submitted any evidence bringing into dispute defendants' position that the regulations relating to property are applicable to all inmates or that Defendants applied the prison property regulations any differently to him than they would any other similarly situated inmates. Therefore, Defendants are entitled to summary adjudication on plaintiff's equal protection claim.

### 3. Due Process

Plaintiff alleges that during his incarceration in Corcoran's Security Housing Unit (SHU), prison staff required him to provide funds for his property to be mailed home, or in the alternative, have the property donated to the state or destroyed. Plaintiff contends that defendants' actions resulted in violation of his due process rights. Plaintiff alleges that defendant Adkinson "acted on orders" to and had plaintiff's property destroyed because plaintiff lacked the funds to send the property home.

Defendants argue that plaintiff has no liberty interest in having the prison store disallowed property. Defendants contend the Due Process Clause is therefore not implicated because the prison's property regulations did not subject Plaintiff to atypical and significant confinement. Defendants frame the issue as not whether Plaintiff may own property but whether Plaintiff can keep all the property he wishes in his cell during his incarceration and when he is sentenced to serve a SHU term for committing a serious rules violation. Defendants contend the prison property policy has a reasonable relation to a legitimate state interest.

An authorized, intentional deprivation of property is actionable under the Due Process Clause. See Hudson v. Palmer, 468 U.S. 517, 532, n.13 (1984)(citing Logan v. Zimmerman Brush Co., 455 U.S. 422 (1982)); Quick v. Jones, 754 F.2d 1521, 1524 (9th Cir. 1985). An authorized deprivation is one carried out pursuant to established state procedures, regulations, or statutes. Logan v. Zimmerman Brush Co., 455 U.S. at 436; Piatt v. McDougall, 773 F.2d 1032, 1036 (9th Cir.

1985); see also Knudson v. City of Ellensburg, 832 F.2d 1142, 1149 (9th Cir. 1987). Authorized deprivations of property are permissible if carried out pursuant to a regulation that is reasonably related to a legitimate penological interest. Turner v. Safley, 482 U.S. 78, 89 (1987).

The parties do not dispute that, at times relevant to this action, inmates in the SHU were subject to the property policy at issue. As discussed above, based on the undisputed evidence, the the regulation at issue is reasonably related to a legitimate penological interest and therefore plaintiff's due process claim must fail as a matter of law.

D.  Conclusion

For the foregoing reasons, the court HEREBY RECOMMENDS that defendants' motion for summary judgment, filed September 12, 2007 be GRANTED, thereby concluding this action in its entirety.

These Findings and Recommendations will be submitted to the United States District Judge assigned to the case, pursuant to the provisions of Title 28 U.S.C. § 636(b)(l). Within **thirty (30) days** after being served with these Findings and Recommendations, the parties may file written objections with the court. The document should be captioned "Objections to Magistrate Judge's Findings and Recommendations." The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order. Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

IT IS SO ORDERED.

Dated:   **April 30, 2008**            /s/ Dennis L. Beck
                                    UNITED STATES MAGISTRATE JUDGE