1

2

3

4

5

6

7

8

# UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

9

GREGORY RHODES,                                CASE NO. 1:02-CV-5476-AWI DLB-P

10
               Plaintiff,                          FURTHER FINDINGS AND
                                   RECOMMENDATIONS RE DEFENDANTS'

11
    v.                                         MOTION FOR SUMMARY JUDGMENT

12

ALAMEIDA, et.al.,                              (Doc. 76)

13
               Defendant.

14
_____/

15    I.      Defendants' Motion for Summary Judgment

16            A.      Procedural History

17            Plaintiff is a state prisoner proceeding pro se and in forma pauperis in this civil action

18    pursuant to 42 U.S.C. § 1983.  This action is proceeding against defendants Alameida, Brown.

19    Vogel, and Adkinson on Plaintiff's claim that defendants Adkinson, Vogel and Brown violated his

20    Fourteenth and Fifth Amendment right to due process by failing to store his disallowed property until

21    he was released from the Security Housing Unit (SHU).  He also claims his rights under the Equal

22    Protection Clause, First Amendment and Eighth Amendment were violated.  On May 1, 2008, the

23    undersigned issued Findings and Recommendations recommending that Defendants motion for

24    summary judgment be granted.  On August 4, 2008, the District Court adopted the Findings and

25    Recommendation in part.  In doing so, the Court granted summary judgment on Plaintiff's First

26    Amendment claim based on the destruction of "other property" and on plaintiff's Equal Protection

27    claim.  The Court referred the motion for summary judgment back to the undersigned on the First

28    Amendment claim based on the destruction of religious property and the motion for summary

1

1   judgment on the Due Process Clause claim to determine if there are disputed issues of material fact

2   and whether Defendants are entitled to summary judgment despite any disputes.  This Court now

3   issues further Findings and Recommendations on these issues.

4                          B.        Legal Standard

5           Summary judgment is appropriate when it is demonstrated that there exists no genuine issue

6   as to any material fact, and that the moving party is entitled to judgment as a matter of law.  Fed. R.

7   Civ. P. 56©).  Under summary judgment practice, the moving party

8                  [A]lways bears the initial responsibility of informing the district court
                   of the basis for its motion, and identifying those portions of "the
9                  pleadings, depositions, answers to interrogatories, and admissions on
                   file, together with the affidavits, if any," which it believes
10                 demonstrate the absence of a genuine issue of material fact.

11  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  "[W]here the nonmoving party will bear the

12  burden of proof at trial on a dispositive issue, a summary judgment motion may properly be made

13  in reliance solely on the 'pleadings, depositions, answers to interrogatories, and admissions on file.'"

14  Id.  Indeed, summary judgment should be entered, after adequate time for discovery and upon

15  motion, against a party who fails to make a showing sufficient to establish the existence of an

16  element essential to that party's case, and on which that party will bear the burden of proof at trial.

17  Id. at 322.  "[A] complete failure of proof concerning an essential element of the nonmoving party's

18  case necessarily renders all other facts immaterial."  Id.  In such a circumstance, summary judgment

19  should be granted, "so long as whatever is before the district court demonstrates that the standard

20  for entry of summary judgment, as set forth in Rule 56©), is satisfied."  Id. at 323.

21          If the moving party meets its initial responsibility, the burden then shifts to the opposing

22  party to establish that a genuine issue as to any material fact actually does exist.  *Matsushita Elec.*

23  *Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986).  In attempting to establish the existence

24  of this factual dispute, the opposing party may not rely upon the denials of its pleadings, but is

25  required to tender evidence of specific facts in the form of affidavits, and/or admissible discovery

26  material, in support of its contention that the dispute exists.  Rule 56(e); *Matsushita*, 475 U.S. at 586

27  n.11.  The opposing party must demonstrate that the fact in contention is material, i.e., a fact that

28  might affect the outcome of the suit under the governing law, *Anderson v. Liberty Lobby, Inc.*, 477

1  U.S. 242, 248 (1986); *T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n*, 809 F.2d 626, 630

2  (9th Cir. 1987), and that the dispute is genuine, i.e., the evidence is such that a reasonable jury could

3  return a verdict for the nonmoving party, *Wool v. Tandem Computers, Inc.*, 818 F.2d 1433, 1436 (9th

4  Cir. 1987).

5      In the endeavor to establish the existence of a factual dispute, the opposing party need not

6  establish a material issue of fact conclusively in its favor.  It is sufficient that "the claimed factual

7  dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at

8  trial."  *T.W. Elec. Serv.*, 809 F.2d at 631.  Thus, the "purpose of summary judgment is to 'pierce the

9  pleadings and to assess the proof in order to see whether there is a genuine need for trial.'"

10 *Matsushita*, 475 U.S. at 587 (quoting Fed. R. Civ. P. 56(e) advisory committee's note on 1963

11 amendments).

12     In resolving the summary judgment motion, the court examines the pleadings, depositions,

13 answers to interrogatories, and admissions on file, together with the affidavits, if any.  Rule 56©).

14 The evidence of the opposing party is to be believed, *Anderson*, 477 U.S. at 255, and all reasonable

15 inferences that may be drawn from the facts placed before the court must be drawn in favor of the

16 opposing party, *Matsushita*, 475 U.S. at 587 (citing *United States v. Diebold, Inc.*, 369 U.S. 654, 655

17 (1962) (per curiam).  Nevertheless, inferences are not drawn out of the air, and it is the opposing

18 party's obligation to produce a factual predicate from which the inference may be drawn. *Richards*

19 *v. Nielsen Freight Lines*, 602 F. Supp. 1224, 1244-45 (E.D. Cal. 1985), aff'd, 810 F.2d 898, 902 (9th

20 Cir. 1987).

21     Finally, to demonstrate a genuine issue, the opposing party "must do more than simply show

22 that there is some metaphysical doubt as to the material facts.  Where the record taken as a whole

23 could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for

24 trial.'"  Matsushita, 475 U.S. at 587 (citation omitted).

25     C.    Undisputed Facts

26 1.    Plaintiff is lawfully incarcerated pursuant to a 1990 conviction for murder.

27 2.    On May 10, 2000, plaintiff was adjudged guilty of committing a serious rule violation and

28       was sentenced to an eighteen month term in the Security Housing Unit (SHU).

3.    On June 20, 2000, plaintiff was received into the Corcoran SHU.

4.    California prison regulations limit the amount and type of property all inmates may possess in prison.  For example, inmates may possess no more than six cubic feet of property, excluding legal property.  Male inmates may not possess more than one ring or rings with stones in them.  Inmates are limited in the type and amount of clothing, hygiene, food, and miscellaneous items they may possess.  Inmates may not possess appliances that are broken or inoperable.  Inmates must be able to show proof of ownership of property.

5.    Inmates housed in the SHU are even more limited in the type and amount of property they may possess.

6.    SHU inmates may only possess 5 books and magazines, 1 legal pad, 15 photographs, and one appliance, ie., either a television or radio, but not both.

7.    When an inmate is received at Corcoran, his property is delivered separately, and is directed to specific staff members who are responsible for examining new inmate property, determining whether the property is allowed and issuing the allowed property to the newly received inmate.

8.    When the inmate is housed in the SHU, the staff member who examines the property is the Facility 4A and/or 4B property officer.

9.    The property officer issues the property the inmate is permitted to possess and the remaining property is held.  The inmate is provided an opportunity to mail the held property out of the prison at his own expense.  If the inmate does not mail the property out after 30 days, the property is either donated or destroyed.

10.   On June 18, 2000, the Corcoran Facility 4-A Property Room received the property of inmate Gregory Rhodes, E-73249, from High Desert State Prison.  Officer Adkison  and the other property officers processed inmate Rhodes' property according to regulations.

11.   The Facility 4-A Property Room inventoried Rhoades' property to make a record of the property he possessed and to inspect and confiscate any property that inmates in the Corcoran SHU may not possess.

12.   Inmate Rhoades possessed certain property that was not permitted.  This property was

1   confiscated.  The items that were  confiscated included aftershave, bandanas, excess books,

2   tapes, letters, magazines, photos and envelopes, soap, socks, tennis shoes, clothing, tobacco,

3   a watch, a radio, a hotpot, a coaxial cable, tatoo equipment, sage and feathers, and a  ring

4   with a stone in it.  These items were recorded on a CDC form, which was provided to Inmate

5   Rhoades.

6   13.   On August 3, 2000, staff in the Property Room issued Rhoades his allowed property.

7   14.   On August 4, 2000, Officer Adkison sent Rhoades a CDC Form 128B, General Chrono.  The

8        CDC Form 128B is a notice that informed Rhoades that he must fill out the paperwork to

9        authorize the Property Room to use his funds to ship out his property and identify the address

10       to ship the funds to, or the property would be donated or destroyed in 30 days, pursuant to

11       institutional regulations and Title 15.

12   15.   Inmate Rhoades never submitted a form permitting staff to use money from his trust account

13       to ship his excess/disallowed property out of the prison.  Neither did he provide an address

14       where the property could be shipped.

15   16.   Defendants contend that on September 19, 2000,  Rhoades' property was disposed of

16       (donated or destroyed) because he had not completed the paperwork necessary to ship the

17       two boxes out of the prison.

18   17.   Officer Adkinson contends that Inmate Rhoades did not inform him before the property was

19       disposed of that any of his property had religious significance.

20   18.   Even if Officer Adkison had known that Rhoades attached religious or spiritual significance

21       to the disallowed items, he would be obliged to follow Corcoran's policies for contraband

22       items.  Adkison states that the only exception to the institution property rules that would

23       permit inmates to possess property otherwise considered to be contraband or disallowed

24       religious items, is when  the inmate property has been certified as being a religious artifact,

25       the religious leader at the prison (with delegated authority from the Warden) must provide

26       the inmate with a written authorization to possess the item, and a statement establishing that

27       the item is a religious artifact.

28   19.   Defendants contends that Inmate Rhoades had no certification establishing that any of his

5

1    property was a religious artifact.

2    20.    Officer Adkison states that if he had been aware that Rhoades had a form establishing that

3           a particular item of his property was a religious artifact, he would not have donated or

4           disposed of that item.

5    21.    On September 9, 2000, Plaintiff filed an inmate grievance contesting the disposal of his

6           property.

7    22.    On October 3, 2000, Officer Adkison timely responded to the grievance at the informal level,

8           explaining that inmate Rhoades' property had been disposed of pursuant to institutional

9           regulations.

10   23.    Sergeant Vogel reviewed inmate Rhoades' appeal at the first formal level of review.

11   24.    It appeared to Sergeant Vogel from a review of the appeal that Rhoades wanted staff to make

12          an exception to the rules and have the prison store his disallowed property at state expense.

13   25.    There was nothing in the appeal that led Vogel to believe any such exception was justified

14          or even permissible and therefore, he denied the appeal.

15   26.    Sergeant Vogel took no other action in connection with inmate Rhoades' property.

16   27.    Sergeant Vogel contends he attempted to enforce Corcoran's and CDCR's regulations for

17          the handling of inmate property to the best of his ability.

18   28.    Chief Deputy Warden Brown reviewed the Rhodes' appeal at the second formal level of

19          review.

20   29.    It appeared to Brown from reviewing the appeal that staff had acted appropriately in

21          withholding Rhoades' disallowed/contraband property and providing him with an

22          opportunity to mail the property to an outside address.

23   30.    Brown denied the appeal.

24   31.    Brown took no other action in connection with inmate Rhoades' property.

25   32.    Brown contends that at all times Brown attempted to enforce Corcoran's and CDCR's

26          regulations for the handling of inmate property to the best of his ability.

27   33.    E. Alameida became the Director of the California Department of Corrections and

28          Rehabilitation on September 22, 2001.

1    34.   CDCR makes religious programs available to all inmates of varying faiths, including

2          religious services, faith-based observances, self study courses and education.

3    35.   While housed in the Corcoran SHU inmate Rhoades was visited by a Native American

4          spiritual advisor who brought sage and tobacco to use in prayers.

5    36.   Rhoades contends Alameida is liable for his loss of property because, as the Director,

6          Alameida permitted the policies to exist whereby correctional staff disposed of Rhoades'

7          property.

8    D.   Discussion

9                1.    Free Exercise Claim

10         Plaintiff contends that defendant Alameida put a policy in place at Corcoran SHU relating

11   to the disposal of inmate property that led to the destruction of his religious property by defendants

12   Adkinson, Vogel and Brown, including a medicine bag, totems created from small beads, eagle

13   feathers ("Religious Property') in violation of his rights under the First Amendment. *See* Amended

14   Complaint, Section IV Statement of Claim.  Plaintiff challenges the policy which states that the

15   property officer shall issue the property the inmate is permitted to possess and shall hold the

16   remaining property; the inmate is provided an opportunity to mail the held property out of the prison

17   at his own expense.  If the inmate does not mail the property out after 30 days, the property is either

18   donated or destroyed.  Plaintiff contends that this policy led to the destruction of his Religious

19   Property because he did not have the funds to have his property sent home.  Plaintiff contends

20   "Defendant had violated Federal Law for having had plaintiff's religious artifacts destroyed.  And

21   also for the record, these "items" of personal property are not contraband and presented no threat to

22   institutional security or the safety of any persons."  Amended Complaint at p.4.

23         The First Amendment to the United States Constitution provides that "Congress shall make

24   no law respecting the establishment of religion, or prohibiting the free exercise thereof . . . ."  U.S.

25   Const., amend. I.  Prisoners "retain protections afforded by the First Amendment," including the free

26   exercise of religion.  *O'Lone v. Estate of Shabazz*, 482 U.S. 342, 348, 107 S.Ct. 2400 (1987).

27         However, "'[l]awful incarceration brings about the necessary withdrawal or limitation of

28   many privileges and rights, a retraction justified by the considerations underlying our penal system.'"

1    Id. (quoting *Price v. Johnson*, 334 U.S. 266, 285, 68 S.Ct. 1049, 1060 (1948)).  In order to establish

2    a free exercise violation, a prisoner must show a defendant burdened the practice of his religion by

3    preventing him from engaging in activities he sincerely believes are mandated by his faith, without

4    any justification reasonably related to legitimate penological interests.  *Shakur v. Schriro*, 514 F.3d

5    878, 884 (9th Cir. 2008) (quotations and citations omitted) (disavowing objective centrality test and

6    confirming applicability of sincerity test).

7           "To ensure that courts afford appropriate deference to prison officials, . . . prison regulations

8    alleged to infringe constitutional rights are judged under a 'reasonableness' test less restrictive than

9    that ordinarily applied to alleged infringements of fundamental constitutional rights."  *O'Lone*, 382

10   U.S. at 349.  Under this standard, "when a prison regulation impinges on inmates' constitutional

11   rights, the regulation is valid if it is reasonably related to legitimate penological interests."  *Turner*

12   *v. Safley*, 482 U.S. 78, 89, 107 S.Ct. 2254 (1987).  First, "there must be a valid, rational connection

13   between the prison regulation and the legitimate government interest put forward to justify it," and

14   "the governmental objective must itself be a legitimate and neutral one."  *Id.*  A second consideration

15   is "whether there are alternative means of exercising the right that remain open to prison inmates."

16   Id. at 90 (internal quotations and citation omitted).  A third consideration is "the impact

17   accommodation of the asserted right will have on guards and other inmates, and on the allocation

18   of prison resources generally."  *Id.*  "Finally, the absence of ready alternatives is evidence of the

19   reasonableness of a prison regulation."  *Id.*

20         The Supreme Court has repeatedly emphasized that, in determining the validity of regulations

21   impinging on the constitutional rights of inmates, courts are to accord great deference to prison

22   officials' assessments of their interests. *Turner v. Safely*, at 84-85, 89.  Nevertheless, deference does

23   not mean abdication. Prison officials must "put forward" a legitimate governmental interest to justify

24   their regulation.  *Id*.

25         The first *Turner* factor requires the court to determine whether there was a legitimate

26   penological interest that is rationally related to the disputed regulation.  482 U.S. at 89.  Prison

27   officials must "put forward" a legitimate government interest to justify their regulation.  *Id.*

28         Defendants claim that the property regulations at Corcoran SHU serve legitimate correctional

and governmental interests in that greater security and control over these inmates is necessary because they have a greater demonstrated propensity for violence and disruptive behavior. Defendants argue:

> The prison regulations proscribing a maximum number of cubic feet of inmate property, and restricting specific items of property serves a legitimate correctional and governmental interest. These policies for the management of inmate property are designed to limit fire hazards, promote quick searches for contraband, and reduce the risk of vermin infiltration associated with overcrowded cells. They also limit CDCR liability for lost or stolen property, and free up valuable storage space at the prison's storage facility. The restrictions on the types of items and the type of clothing inmates may possess prevents inmates from fighting over expensive items, prevents inmates from identifying themselves with disruptive groups by associating groups of inmates with clothing brands or logos, prevents inmates from possessing clothing that could be mistaken for staff uniforms, and prevents escapes. These interest

9

s
justify
t h e
prison
regulat
i o n s
limitin
g the
t y p e
a n d
amount
of
property inmates may possess in prison.

Motion for Summary Judgment, p.5:27-28 - 61-10.

Defendants submit the Declaration of R. Vogel, Correctional Sergeant at Corcoran, who states, "[w]hen an inmate is received at Corcoran, his property is delivered separately and directed to specific staff members who are responsible for examining new inmate property, determining whether the property is allowed and issuing the allowed property to the newly received inmate." *See* DUF 7.  When the inmate is housed in the Security Housing Unit, the staff member who examines the property is the Facility 4A, and/or4B property officer.  DUF 8.  The property officer issues the property the inmate is permitted to possess and the remaining property is held.  The inmate is provided an opportunity to mail the held property out of the prison at his own expense.  If the inmate does not mail the property out after 30 days, the property is either donated or destroyed.  DUF 9. California Code of Regulations Title 15 section 3191(c) states that when inmates fail to provide funds and an address to ship unauthorized property home, staff will donate the useable items and destroy the perishable items.

Defendants have failed to meet their burden as the party moving for summary judgment as to the first prong of the *Turner* analysis.  Defendants have failed to submit any evidence demonstrating a  legitimate government interest justifying the policy at Corcoran which requires inmates to pay to have their disallowed or extra property mailed to a family member or friend or face destruction of the property by prison officials.  Defendants cite to the policy itself and provide the declaration of R. Vogel.  However, Mr. Vogel's declaration merely recites the policy and is not probative evidence that the policy was adopted in furtherance of a legitimate government interest.

10

1    As to the property restrictions, Defendants argue that the restrictions serve security and safety

2    concerns which are legitimate correctional and governmental interests.  The only evidence provided

3    to support this argument is the declaration of defendant Adkison who states that during his training

4    and experience, he has "been instructed that the purpose of the additional restriction is to keep

5    greater security and control over SHU inmates, since these inmates have a greater demonstrated

6    propensity for violence and disruptive behavior."  Adkison Decl. ¶ 4.   As noted by the District

7    Court, this evidence is based only on what defendant Adkison was told the purpose behind the

8    regulation was.  Defendant Adkison has no personal knowledge of the reasons for and objectives of

9    the property restrictions.  The declaration is not sufficient evidence to demonstrate the purpose of

10   the property restrictions was to provide greater security.

11       In light of the District Court's Order, the Court has conducted a further review of the evidence.

12   In doing so, the Court finds that Defendants have failed to put forth evidence of the legitimate

13   governmental interest justifying the disputed policies and regulations.  Nor have defendants shown

14   or even argued that their objectives were neutral. On the present record, Defendants have not satisfied

15   the first requirement of the *Turner* test, as they have not shown a valid, rational connection between

16   their policies and a legitimate governmental interest.  A regulation cannot be sustained where the

17   logical connection between the regulation and the asserted goal has not been demonstrated and the

18   legitimacy and neutrality of the governmental objective has not been shown.  *Turner*, 482 U.S. at 89-

19   90. Because the first *Turner* factor "'constitutes *sine qua non*," a court need not reach the remaining

20   three factors if the regulation at issue is not rationally related to a legitimate and neutral governmental

21   objective.  *Prison Legal News v. Lehman*, 397 F.3d 692, 699 (9th Cir. 2005).  However, the Court will

22   address them briefly.

23       Under the second *Turner* factor, the court considers whether plaintiff has "alternative means

24   by which he can practice his religion" or is "denied all means of religious expression."  Defendants

25   contend that plaintiff had alternative means of exercising his religion.  They submit evidence that

26   while Plaintiff was housed in the Corcoran SHU, he was visited by a Native American spiritual

27   advisor who brought sage and tobacco to use in prayers.  DUF 35.  Defendants also submit evidence

28   that CDCR makes religious programs available to all inmates of varying faiths, including religious

1    services, faith based observances, self study courses and education.  DUF 34.

2         Plaintiff does not dispute that he was visited by a Native American Spiritual Leader, who

3    brought sage and tobacco to use in prayer.  *See* Opposition at p.7:19-21.  However, plaintiff argues

4    that some of his religious items were unique and "personal in nature" and by destroying the property,

5    Defendants removed all alternatives to his practice with these items.

6         In evaluating the second prong of the *Turner* test, the relevant inquiry is not whether the

7    inmate has an alternative means of engaging in a particular religious practice that he or she claims is

8    being affected; rather the court is to determine whether the inmates have been deprived all means of

9    religious expression.  *See  O'Lone v. Estate of Shabazz*, 482 U.S. 342, 348, 107 S.Ct. 2400 (1987).

10   While Plaintiff was prevented from using particular religious items, he was not deprived of all means

11   of religious expression.  Consequently, the second *Turner* factor weighs in Defendants' favor.

12        Under the third prong of the *Turner* test the court must consider the impact the

13   accommodation would have on guards and other inmates and on the allocation of prison resources

14   generally.  Defendants contend the third *Turner* factor weighs in their favor in that abolishing the

15   prison regulations on inmate property would create serious risks to the health and safety of inmates

16   and staff and impose a financial burden on the prison system.  Defendants argue if the prison could

17   not limit the amount and type of property inmates may possess, the already crowded prisons would

18   become unmanageable.  Defendants contend excessive property would create fire and health hazards

19   and permit inmates to hide weapons in crowded cells; without restrictions on clothing items, inmates

20   could impersonate staff and identify more easily with disruptive groups; inmates who possess rings

21   with stones in them could fashion the stones into cutting weapons; and further requiring CDCR to

22   store inmate property or pay the postage costs for inmates to mail out their property would impose

23   too high a cost on public resources.  Defendants therefore argue that abolishing the prison regulations

24   on inmate property would create serious risks to the health and safety of inmates and staff and impose

25   a financial burden on the prison system.

26        Defendants again submit argument but no evidence in support of their contentions and

27   therefore fail to meet their burden as to the third prong of the *Turner* analysis.  The Court notes

28   however that it is difficult to imagine how abolishing the property regulations at issue would not have

1    a significant impact on guards and the allocation of prison resources.

2            Finally, the fourth *Turner* factor requires the court to consider whether there are ready

3    alternatives to the prison's current policy that would accommodate Plaintiff at de minimus cost to the

4    prison.  The "existence of obvious, easy alternatives may be evidence that the regulation is not

5    reasonable, but is an 'exaggerated response' to prison concerns." *Turner*, 482 U.S. at 90.

6    Defendants  submit evidence that the regulations provide an alternative to destruction of inmate

7    religious property by permitting inmates to possess what might otherwise be contraband items if they

8    have been certified as being a religious artifact.  DUF 18.  Defendants contend for an item of inmate

9    property to be considered a religious artifact, the religious leader at the prison must provide the inmate

10   with a written authorization to possess the item and a statement establishing that the item is a

11   religious artifact.  Thus, Defendants contend the existing regulations provide for a relatively simple

12   alternative.  Defendants are unaware of any other obvious, readily available alternatives that would

13   preserve the institutional need to keep control over inmate property while at the same time

14   maintaining a safe, clean institutional environment.

15           Plaintiff argues that an alternative to destroying SHU inmates' religious property is utilize

16   DOM Section 54030.11 which provides that property for inmates placed in temporary administrative

17   segregation and special housing units shall be stored in R&R or in administrative segregation property

18   rooms (if available).  Plaintiff concedes that the regulation at issue here provides an alternative for

19   religious artifacts and contends that he had the required certification.  *See* Opposition, Exhibit "A."

20           Other than the alternative provided by the regulation itself, Plaintiff has failed to demonstrate

21   an obvious readily available alternative.    Plaintiff references DOM Section 54030.11 but fails to

22   address the obvious issues associated with applying the provision to all SHU inmates.  Thus the fourth

23   *Turner* factor also weighs in favor of Defendants.  However, as discussed, because Defendants have

24   failed to meet their burden as to the first factor, summary judgment on Plaintiff's Free Exercise claim

25   must be denied.

26           2.       Application of Policies to Plaintiff's Religious Property

27           Although Defendants have not met their burden to establish that the property regulations at

28   issues were valid, the Court will address Plaintiff's argument that  he had documentation establishing

13

1  that his property items were religious artifacts and therefore the property fell within the purview of

2  the regulations.

3       Defendant Adkinson claims plaintiff's property was disposed of in accordance with prison

4  regulations because Plaintiff did not complete the paperwork necessary to ship the boxes out of

5  storage.  Adkison Decl. ¶ 13.  Adkison contends that Plaintiff never informed him that any of the

6  property had any religious significance.  *Id.*  Adkison states that if he had known that Plaintiff

7  attached religious significance to the disallowed items, he would be obligated to follow Corcoran's

8  policies for contraband items.  *Id.*  ¶ 15.  In order for the exception for religious property to apply,

9  Adkison contends Plaintiff's artifacts would have had to be certified by a religious leader at the prison

10 (with delegated authority from the Warden) and Plaintiff would have had to have written

11 authorization to possess the items with a statement establishing that the items were religious artifacts.

12 *Id*, Attach.4.  Adkison contends that plaintiff had no certification establishing that any of his property

13 was a religious artifact and therefore he disposed of the property pursuant to CDCR's regulations for

14 handling inmate property.  Adkison Decl. ¶ 20.  Adkison states that if he had been aware that plaintiff

15 had a form establishing that a particular item of his property was a religious artifact, he would not

16 have donated or disposed of that item.  *Id*. ¶ 16.

17      A genuine issue exists as to whether Plaintiff informed Adkison that his property had religious

18 significance and whether he had proper documentation to retain the property.  In addition, Plaintiff

19 contends that he informed defendants that his property had religious significance through a  CDCR

20 602 inmate grievance form which he contends he filed before the destruction of his property and

21 before the 30 day deadline.  Plaintiff's Statement of Undisputed Facts ("PUF") No. 15.  Plaintiff's

22 property form also identified some of his property as "religious material."  *See* Adkison Decl., Att.

23 2.  Plaintiff also states that he sent Adkinson a CDCR GA-22 Inmate Request for Interview Form,

24 "letting him know that I was filing a CDCR 602 grievance to save my property from being destroyed."

25 PUF 17.  In addition, Plaintiff contends that he had the required CDCR Religious Property Chrono

26 *see* Plaintiff's Opposition, Exhibit "A".

27      There is a genuine issue of material fact as to Adkison's knowledge of the religious nature of

28 plaintiff's property and whether plaintiff had authorization to keep the property.  These issues must

1    be resolved at trial, assuming Defendants are able to establish the validity of the regulations.  Further,

2    where there are factual disputes as to the parties' conduct or motives, the case cannot be resolved at

3    summary judgment on qualified immunity grounds.  *See Liston v. County of Riverside*, 120 F.3d 965,

4    967 (9th Cir. 1997); *Collins v. Jordan*, 110 F.3d 1363, 1369 (9th Cir. 1997); *Alexander v. City of San*

5    *Francisco*, 29 F.3d 1355, 1364 (9th Cir. 1994); *ACT UP!/Portland v. Bagley*, 988 F.2d 868, 873 (9th

6    Cir. 1993).

7            3.      Due Process Claim

8            Plaintiff alleges that during his incarceration in Corcoran's Security Housing Unit (SHU),

9    prison staff required him to provide funds for his property to be mailed home, or in the alternative,

10   have the property donated to the state or destroyed.  Plaintiff contends that Defendants' actions

11   resulted in violation of his due process rights.  Plaintiff alleges that defendant Adkison "acted on

12   orders" to and had plaintiff's property destroyed because plaintiff lacked the funds to send the

13   property home.

14           Defendants argue that plaintiff has no liberty interest in having the prison store disallowed

15   property.  Defendants contend the Due Process Clause is therefore not implicated because the prison's

16   property regulations did not subject Plaintiff to atypical and significant confinement.  Defendants

17   frame the issue as not whether Plaintiff may own property but whether Plaintiff can keep all the

18   property he wishes in his cell during his incarceration and when he is sentenced to serve a SHU term

19   for committing a serious rules violation.  As argued above, Defendants contend the prison property

20   policy has a reasonable relation to a legitimate state interest.

21           An authorized, intentional deprivation of property is actionable under the Due Process Clause.

22   *See Hudson v. Palmer*, 468 U.S. 517, 532, n.13 (1984)(citing *Logan v. Zimmerman Brush Co.*, 455

23   U.S. 422 (1982)); *Quick v. Jones*, 754 F.2d 1521, 1524 (9th Cir. 1985).  An authorized deprivation

24   is one carried out pursuant to established state procedures, regulations, or statutes.  *Logan v.*

25   *Zimmerman Brush Co.*, 455 U.S. at 436; *Piatt v. McDougall*, 773 F.2d 1032, 1036 (9th Cir. 1985);

26   *see also Knudson v. City of Ellensburg*, 832 F.2d 1142, 1149 (9th Cir. 1987). Authorized deprivations

27   of property are permissible if carried out pursuant to a regulation that is reasonably related to a

28   legitimate penological interest.  *Turner*, 482 U.S. at 89.

1   The parties do not dispute that at times relevant to this action, inmates in the SHU were

2   subject to the property policy at issue.  As discussed above, Defendants have failed to meet their

3   burden to establish as a matter of law that the regulation at issue is reasonably related to a legitimate

4   penological interest.  Therefore, Defendants' motion on plaintiff's Due Process claim must also be

5   denied.

6           4.       Defendants Vogel and Brown

7   Defendants present evidence that defendant Vogel's conduct in this case was limited to

8   reviewing plaintiff's appeal at the first formal level on or about November 9, 2000.  Vogel

9   Declaration, ¶¶ 6-7, DUF 23.  Defendants also present evidence that defendant Brown subsequently

10  reviewed plaintiff's appeal at the second level of formal review.  Brown Declaration ¶¶ 3-4.  Both of

11  these defendants denied plaintiff's appeal but took no other action in connection with plaintiff's

12  property.  DUF 26, 31.

13  Plaintiff does not dispute that these Defendants' involvement was limited to reviewing his

14  appeals but argues Defendants "had sufficient notice of plaintiff's grievance and failed to adequately

15  look into his property concerns of being indigent and/or having no one to send his property to.

16  Opposition, p.23.  Plaintiff alleges that defendant Vogel failed to investigate and defendant Brown

17  "failed to give plaintiff's CDCR "602 grievance" claims any credence and therefore he summarily

18  denied plaintiff's appeal.

19  To state a claim under section 1983, a plaintiff must allege that (1) the defendant acted under

20  color of state law and (2) the defendant deprived him of rights secured by the Constitution or federal

21  law.  *Long v. County of Los Angeles*, 442 F.3d 1178, 1185 (9th Cir. 2006).  "[A prison] grievance

22  procedure is a procedural right only, it does not confer any substantive right upon the inmates."

23  *Buckley v. Barlow*, 997 F.2d 494, 495 (8th Cir. 1993) (citing *Azeez v. DeRobertis*, 568 F. Supp. 8, 10

24  (N.D. Ill. 1982)); see also *Ramirez v. Galaza*, 334 F.3d 850, 860 (9th Cir. 2003) (no liberty interest

25  in processing of appeals because no entitlement to a specific grievance procedure); *Massey v. Helman*,

26  259 F.3d 641, 647 (7th Cir. 2001) (existence of grievance procedure confers no liberty interest on

27  prisoner); *Mann v. Adams*, 855 F.2d 639, 640 (9th Cir. 1988).  Actions in reviewing prisoner's

28  administrative appeal cannot serve as the basis for liability under a section 1983 action.  Buckley, 997

1  F.2d at 495.  Thus, defendants Vogel and Brown are entitled to summary judgment.

2          D.      Conclusion

3          For the foregoing reasons, the court HEREBY RECOMMENDS that Defendants' motion for

4  summary judgment, filed September 12, 2007  be GRANTED IN PART AND DENIED IN PART

5  as follows:

6          1.      Defendants' motion for summary judgment on Plaintiff's First Amendment claim

7                  based on the destruction of Religious Property be DENIED;

8          2.      Defendants motion for summary judgment on Plaintiff's Due Process Clause claim

9                  be DENIED;

10         3.      Defendants Vogel and Brown's motion for summary judgment be GRANTED and

11                 these defendants be dismissed from this action; and

12         4.      This case proceed to trial on Plaintiff's First Amendment and Due Process Claims

13                 based on the destruction of Religious Property against defendants Alameida and

14                 Adkison.

15         These Findings and Recommendations will be submitted to the United States District Judge

16  assigned to the case, pursuant to the provisions of Title 28 U.S.C. § 636(b)(l).  Within **thirty (30)**

17  **days** after being served with these Findings and Recommendations, the parties may file written

18  objections with the court.  The document should be captioned "Objections to Magistrate Judge's

19  Findings and Recommendations."  The parties are advised that failure to file objections within the

20  specified time may waive the right to appeal the District Court's order.  Martinez v. Ylst, 951 F.2d

21  1153 (9th Cir. 1991).

22

23      IT IS SO ORDERED.

24    **Dated:    December 12, 2008**              **/s/ Dennis L. Beck**
                                              UNITED STATES MAGISTRATE JUDGE
25

26

27

28

17